FILED

2013 AUG 20   PM 12: 42

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

June 2013 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>ABBAS MORADI,<br>AMIRREZA SAHEBJAMEI,<br>SHAHIN TABATABAEI,<br>  aka "Shahin Tabatabae,"<br>  aka "Sean Tabaei,"<br>  aka "Sean Taba"<br>  aka "Gary Sean Williams,"<br>  aka "Alex Moore," and<br>SEYED MOHAMMAD AKHAVAN FATEMI,<br><br>            Defendants. | SA CR No. 13 CR 13 00158<br><br>I N D I C T M E N T<br><br>[50 U.S.C. §§ 1701-1707; 31<br>C.F.R. §§ 560.203, 560.204:<br>Conspiracy to Violate the<br>International Emergency<br>Economic Powers Act; 50 U.S.C.<br>§§ 1701-1707; 31 C.F.R.<br>§ 560.204:   International<br>Emergency Economic Powers Act] |

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment:

Defendants and Entities

1.    Defendant ABBAS MORADI ("MORADI") was the Chairman and

Managing Director of Control Farayand Abzar Daghigh ("CFAD"),

which was located in Iran.  Defendant AMIRREZA SAHEBJAMEI ("SAHEBJAMEI") worked for defendant MORADI at CFAD.

2.   Defendant SHAHIN TABATABAEI also known as ("aka") "Shahin Tabatabae," aka "Sean Tabaei," aka "Sean Taba" aka "Gary Sean Williams," aka "Alex Moore" ("TABATABAEI"), was the owner and operator of Grupocanamex ("GIC"), which was located in Mexico, and Canadian Industrial Solutions ("CIS"), which located in Canada.

3.   Defendant SEYED MOHAMMAD AKHAVAN FATEMI ("AKHAVAN") was the owner and operator of IRCA Group ("IRCA"), which was located in Canada.

4.   Unindicted Coconspirator #1 was the Managing Director of a Limited Liability Company ("LLC"), which was located in Dubai, United Arab Emirates ("UAE").  Unindicted Coconspirators #2 and #3 worked for Unindicted Coconspirator #1 at the LLC.

5.   Coconspirators #4 and #5 were located in Orange County, within the Central District of California.

6.   A company that sold pressure transducers and related equipment ("U.S. Company #1") was located in Leonia, New Jersey.

7.   A company that sold thermal imagers and related equipment ("U.S. Company #2") was located in Santa Clara, California.

8.   A company that sold solenoid valves and related equipment ("U.S. Company #3") was located in Montville, New Jersey.

9.   A company that sold battery chargers and related equipment ("U.S. Company #4") was located in Lake Forest, California, within the Central District of California.

10.   A company that sold motors and related equipment ("U.S. Company #5") was located in Dayton, Ohio.

11.   Emails sent among the coconspirators and to or from other persons were sent in the English, Farsi, and Spanish languages.   All direct quotations from emails referenced herein are as they appeared in the emails in the English language, including misspellings.

12.   The Grand Jury incorporates by reference and realleges these Introductory Allegations into each and every count of this Indictment as though fully alleged therein.

1                            COUNT ONE

2        [50 U.S.C. §§ 1701-1707; 31 C.F.R. §§ 560.203 and 560.204]

3    A.   OBJECTS OF THE CONSPIRACY

4        13.  Beginning at least as early as in or about January

5    2007, and continuing up to and including at least May 31, 2011,

6    in Orange County, within the Central District of California, and

7    elsewhere, defendants MORADI, SAHEBJAMEI, TABATABAEI, and

8    AKHAVAN, and others known and unknown to the Grand Jury,

9    conspired and agreed with each other to knowingly and

10   intentionally commit offenses against the United States, namely:

11            a.   To export, and attempt to export, pressure

12   transducers, thermal imagers, solenoid valves, battery chargers,

13   and gearmotors from the United States, via Canada, Mexico, the

14   UAE, and Turkey, to Iran, in violation of the regulations that

15   apply to exports to Iran, without first having applied for, or

16   through such application obtained, from the United States

17   Department of Treasury, Office of Foreign Assets Control, a

18   license or authorization for such export, in violation 50 U.S.C.

19   §§ 1701-1707, and 31 C.F.R. § 560.204; and

20            b.   To knowingly and willfully enter into

21   transactions within the United States that evaded and avoided,

22   and had the purpose of evading and avoiding, the regulations

23   governing trade and exports from the United States to Iran, in

24   violation of 50 U.S.C. §§ 1701-1707, and 31 C.F.R. § 560.203.

25   B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

26        ACCOMPLISHED

27        14.  The objects of the conspiracy were to be accomplished

28   in substance as follows:

                                  4

a.   Defendants MORADI and SAHEBJAMEI would take incoming orders for CFAD from Iranian companies requesting various U.S.-made goods.

b.   Defendant MORADI would request that defendant TABATABAEI purchase U.S.-made goods from U.S. Companies #1-5.

c.   Using false names and making representations that false end-users would use the U.S.-made goods and that the goods would be used for false end uses, defendant TABATABAEI would purchase U.S.-made goods from U.S. Companies #1-5.

d.   Defendant AKHAVAN would accept shipment of U.S.-made goods in Canada, facilitate payment for those U.S.-made goods, and forward U.S.-goods to Unindicted Coconspirators #1, #2, and #3 in the UAE.  Defendant AKHAVAN would also facilitate payment for U.S.-made goods to defendant TABATABAEI.

e.   Unindicted Coconspirator #1 would ship the U.S.-made goods received from defendant TABATABAEI to defendant MORADI in Iran.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants MORADI, SAHEBJAMEI, TABATABAEI, and AKHAVAN, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, on or about the dates identified below, including but not limited to the following:

PURCHASE AND SHIPMENT OF PRESSURE TRANSDUCERS

Overt Act #1:  On or about November 8, 2007, defendant MORADI sent an email to defendant TABATABAEI requesting that defendant TABATABAEI purchase 100 "ETM-375-1.7Bar" pressure

5

1  transducers and 25 "ETM-300-375-350Bar" pressure transducers
2  ("the 125 transducers") manufactured by U.S. Company #1.

3      Overt Act #2:  On or about November 8, 2007, defendant
4  TABTATABAEI sent an email to defendant MORADI with an attached
5  invoice and stating that defendant TABATABAEI would discuss
6  funding with defendant AKHAVAN.  The invoice stated that the
7  cost of the 125 transducers was $87,625 and that the transducers
8  were manufactured in the United States.

9      Overt Act #3:  On or about November 8, 2007, defendant
10  TABATABAEI, using the alias "Sean Tabaei," sent an email to U.S.
11  Company #1 requesting a price quotation for the 125 transducers.

12      Overt Act #4:  On or about November 19, 2007, defendant
13  TABATABAEI sent U.S Company #1 an "End Use Certificate" for the
14  125 transducers in which defendant TABATABAEI falsely affirmed,
15  "The sale and export of these goods and technology/technical
16  data are governed by U.S. law.  I certify that these will not be
17  resold or retransferred in a matter contrary to that law....
18  [T]his includes, but is not limited to, resale or re-transferal
19  to any entity in ... Iran."

20      Overt Act #5:  On or about February 13, 2008, defendant
21  MORADI sent an email to defendant TABATABAEI and requested
22  delivery of the 125 transducers before the end of March because
23  "Iran will be in Holidays and impossible to deliver goods &
24  settle payment."

25      Overt Act #6:  On or about March 27, 2008, defendant
26  TABATABAEI sent an email to defendant AKHAVAN stating that the
27  125 transducers were ready to ship and that defendant AKHAVAN
28  needed to pay $68,930 to the supplier.

Overt Act #7:  On or about April 7, 2008, defendant TABATABAEI caused U.S. Company #1 to ship the 125 transducers from the U.S. to Canada.

Overt Act #8:  On or about April 8, 2008, defendant TABATABAEI forwarded the February 13, 2008 email discussed in Overt Act #5 to defendant AKHAVAN and Unindicted Coconspirators #1 and #2 and asked defendant AKHAVAN to arrange for pickup of the 125 transducers.

Overt Act #9:  On or about April 8, 2008, Unindicted Coconspirator #3 sent an email to defendant TABATABAEI and Unindicted Coconspirator #1 regarding the 125 transducers, stating that defendant MORADI "informed us that he has made the FULL payment to [defendant AKHAVAN] in Equivalent Rials in Tehran."  Defendant TABATABAEI replied to defendant AKHAVAN and Unindicted Coconspirators #1 and #3 that payment had been made to defendant AKHAVAN.

Overt Act #10:  On or about May 1, 2008, defendant TABATABAEI received an email from a person who worked for defendant AKHAVAN stating that the 125 transducers had arrived in Canada and requesting further instructions.

Overt Act #11:  On or about May 2, 2008, defendant MORADI sent an email to defendant AKHAVAN asking when the 125 transducers would be shipped to Iran.

Overt Act #12:  On or about May 2, 2008, defendant MORADI sent an email to defendants TABATABAEI and AKHAVAN stating that defendant TABATABAEI had promised that the 125 transducers would be shipped to Iran by defendant AKHAVAN after they arrived in Canada on April 28, 2008.

1     Overt Act #13:  On or about May 3, 2008, defendant

2  TABATABAEI sent an email to defendant MORADI stating that the

3  125 transducers had arrived and that the LLC would arrange to

4  have them picked up on Monday.  Defendant MORADI later forwarded

5  the email to defendants TABATABAEI and AKHAVAN.

6     Overt Act #14:  On or about May 15, 2008, defendant

7  TABATABAEI paid U.S. Company #1 with a check for $19,215.

8     Overt Act #15:  On or about June 10, 2008, Unindicted

9  Coconspirator #3 sent an email to defendants MORADI and

10  Unindicted Coconspirator #1 stating that the 125 transducers

11  would be shipped from Dubai to Tehran.

12     Overt Act #16:  On or about June 18, 2008, defendant

13  TABATABAEI paid U.S. Company #1 with a check for $7,832.40.

14     Overt Act #17:  On or about July 9, 2008, defendant

15  TABATABAEI forwarded an email from Unindicted Coconspirator #3

16  to defendant AKHAVAN listing the shipping fees and stating, "let

17  me know about the Payment of CIS05 once you hear from" defendant

18  AKHAVAN.

19     Overt Act #18:  On or about November 17, 2008,

20  coconspirator #5 sent an email to defendants TABATABAEI,

21  AKHAVAN, and Unindicted Coconspirator #1.  The email contained

22  an attachment entitled "Statement of Account" for CIS and noted

23  that on September 4, 2008, funds for the 125 transducers order

24  were received by defendant AKHAVAN.

25  PURCHASE AND SHIPMENT OF THE THERMAL IMAGER

26     Overt Act #19:  On or about January 23, 2007, defendant

27  MORADI sent an email to Unindicted Coconspirators #1, #2, and #3

28

asking that the LLC obtain a price quotation from defendant

TABATABAEI for a thermal imager manufactured by U.S. Company #2.

Overt Act #20:  On or about January 23, 2007, defendant

TABATABAEI sent an email to Unindicted Coconspirator #1 listing

prices for various goods manufactured by U.S. Company #2.

Overt Act #21:  On or about August 6, 2007, defendant

MORADI sent an email to Unindicted Coconspirators #2 and #3 that

stated defendant TABATABAEI should ensure that the goods be

delivered to defendant TABATABAEI's office in Canada and not a

location where defendant MORADI would not be able to obtain

them.

Overt Act #22:  On or about October 1, 2007, defendant

TABATABAEI sent an email to defendant MORADI which stated that

the cost of a thermal imager from U.S. Company #2 was $49,000

USD.

Overt Act #23:  On or about April 8, 2008, defendant

TABATBAEI provided Unindicted Coconspirator #1 a price quotation

in the amount of $100,443.50 for a Model M9104W thermal imager

camera and a calibration device ("the thermal imager").

Overt Act #24:  On or about May 6, 2008, defendant MORADI

sent an email to defendants TABATABAEI and AKHAVAN and

Unindicted Coconspirators #1, #2, and #3 asking defendant

TABATABAEI and Unindicted Coconspirator #3 to place the order

for the thermal imager.

Overt Act #25:  On or about May 7, 2008, defendant

TABATABAEI sent an email to defendants MORADI and AKHAVAN and

Unindicted Coconspirator #1 thanking defendant MORADI for the

thermal imager and stating that defendant MORADI needed "TO BE MORE PATIENT SINCE NOW [his] MARKET IS IN THE THIRD SANCTION."

Overt Act #26:  On or about May 31, 2008, defendant MORADI sent an email to defendants TABATABAEI and AKHAVAN and Unindicted Coconspirator #1 asking that they update defendant MORADI as to when the thermal imager would be delivered.

Overt Act #27:  On or about June 5, 2008, defendant TABATABAEI sent an email to defendants MORADI and AKHAVAN and Unindicted Coconspirator #1 stating that the thermal imager was scheduled to arrive in Canada on June 16, 2008.

Overt Act #28:  On or about June 5, 2008, defendant TABATABAEI sent an email to defendant AKHAVAN updating him on "our current orders."  Attached to the email was an invoice for the thermal imager.

Overt Act #29:  On or about July 17, 2008, defendant TABTABAEI sent an email to defendant MORADI and Unindicted Coconspirators #1, #2 and #3 asking Unindicted Coconspirator #2 to arrange for delivery of the thermal imager order to the UAE.

Overt Act #30:  On or about July 30, 2008, defendant TABATABAEI sent an email to defendant AKHAVAN with an attachment that showed the "Statement of Account" for CFAD.  The attachment noted that CFAD had a balance of 10,545.51 AED for the thermal imager.

Overt Act #31:  On or about August 18, 2008, defendant TABATABAEI sent an email to defendant AKHAVAN stating that defendant AKHAVAN should write a check from the "CIS US or CND Account" to the shipping company and that defendant AKHAVAN should take one check for $10,000.  Defendant TABATABAEI also

stated that he hoped to see defendant AKHAVAN during his upcoming trip to Iran.

Overt Act #32:  On or about August 20, 2008, defendant TABATABAEI sent an email to Unindicted Coconspirator #2 that the thermal imager would arrive in Canada on August 24, 2008.

Overt Act #33:  On or about August 22, 2008, defendant TABATABAEI sent an email to defendant AKHAVAN that, per their telephone conversation, defendant AKHAVAN needed to fill out the "attached form" for the thermal imager.  Attached to the email was a credit card authorization form for a shipping company.

Overt Act #34:  On or about August 22, 2008, defendant AKHAVAN sent an email to defendant TABATABAEI.  Attached to the email was a credit card authorization form for the shipping company containing credit card information for CIS which was filled out and signed by defendant AKHAVAN.

Overt Act #35:  On or about September 2, 2008, defendant TABATABAEI sent an email to defendant AKHAVAN asking him to confirm numbers with respect to the thermal imager on the "CIS account."

Overt Act #36:  On or about September 5, 2008, defendant TABATABAEI sent an email to defendants MORADI and Unindicted Coconspirator #1 stating that the thermal imager had been picked up from CIS the day before.

Overt Act #37:  On or about September 9, 2008, Unindicted Coconspirator #2 sent an email to defendant MORADI stating that the thermal imager was expected to arrive in the UAE that evening.

Overt Act #38:  On or about November 16, 2008, defendant TABATABAEI sent an email to defendant AKHAVAN and Unindicted Coconspirators #2 and #3 stating that defendant TABATABAEI had a $948 credit with the LLC which was to be used for part of the freight charges.

Overt Act #39:  On or about December 3, 2008, defendant MORADI told defendant TABATABAEI that the thermal imager might not be compatible with the user's power supply because the unit was marked with 60 hertz.

Overt Act #40:  On or about January 12, 2009, defendant TABATABAEI sent an email to defendant MORADI that stated he had requested that the thermal imager be set at 220 volts to work in defendant MORADI's "market," but that the only option U.S. Company #2 had was 220 volts, 60 hertz, as that was the power supply in North America.  Defendant TABATABAEI also stated that he could not "push [U.S. Company #2] harder," as it would affect his future business.

Overt Act #41:  On or about April 12, 2009, defendant MORADI sent an email to defendant TABATABAEI that stated he could not download information pertaining to the thermal imager from U.S. Company #2's website, possibly "because of Iran" and that defendant TABATABAEI should send him a compact disc with the information.

THE PURCHASE AND SHIPMENT OF THE SOLENOID VALVES

Overt Act #42:  On or about September 9, 2009, defendant MORADI sent an email to defendant TABATABAEI requesting a price quotation for solenoid valves manufactured by U.S. Company #3.

1    Overt Act #43:  On or about December 28, 2009, defendant
2  TABATABAEI sent an email to defendant MORADI with a quotation
3  for ten solenoid valves priced at $5,785 each.

4    Overt Act #44:  On or about January 9, 2010, defendant
5  MORADI sent an email to defendant TABATABAEI to place the order
6  for ten solenoid valves with U.S. Company #3.

7    Overt Act #45:  On or about January 20, 2010, defendant
8  TABATABAEI told an employee at U.S. Company #3 that defendant
9  TABATABAEI's company would be using the solenoid valves.

10    Overt Act #46:  On or about January 21, 2010, defendant
11  TABATABAEI sent a facsimile to U.S. Company #3 for the purchase
12  of ten 3 way, 2 position, type SV326S8 solenoid valves ("the
13  valves") for $4,775 each, for total cost of $47,750.

14    Overt Act #47:  On or about January 26, 2010, the LLC
15  transferred $11,768 USD to CIS for the valves.

16    Overt Act #48:  On or about February 11, 2010, defendant
17  TABATABAEI sent an email to U.S. Company #3 that stated that the
18  valves were to be used by defendant TABATABAEI's "plant in BC,
19  Canada."

20    Overt Act #49:  On or about March 15, 2010, defendant
21  MORADI sent an email to Unindicted Coconspirator #3 at the LLC
22  stating that he had paid $29,420 to defendant TABATABAEI for the
23  valves.

24    Overt Act #50:  On or about March 28, 2010, defendant
25  TABATABAEI sent an email to defendant MORADI stating that
26  defendant TABATABAEI had documentation showing that the LLC had
27  transferred the money for the valves to defendant TABATABAEI and

28

that defendant TABATABAEI expected to have the money in his possession by the following Monday or Tuesday.

Overt Act #51:  On or about April 14, 2010, defendant TABATABAEI sent an email to U.S. Company #3 stating that he had the remaining balance of $24,750 ready to pay to U.S. Company #3 and that he would like to have the valves before May 20, 2010.

Overt Act #52:  On or about May 18, 2010, defendant TABATABAEI sent an email to U.S. Company #3 stating that he had wired the funds for the valves and sent a second email asking when the valves would be ready for pickup.

Overt Act #53:  On or about May 21, 2010, defendant TABATABAEI caused the valves to be sent by U.S. Company #3 to the residence of Unindicted Coconspirators #4 and #5, located in Orange County, within the Central District of California.

Overt Act #54:  On or about May 24, 2010, defendant TABATABAEI sent an email to defendant MORADI stating that the valves were on the way to defendant TABATABAEI's "U.S. location."

Overt Act #55:  On or about June 1, 2010, defendant TABATABAEI sent an email to Unindicted Coconspirators #4 and #5 asking that Unindicted Coconspirator #5 print out the attached invoice regarding the valves and that defendant TABATABAEI would arrange shipment of the valves with United Parcel Service ("UPS").

Overt Act #56:  On or about June 2, 2010, Unindicted Coconspirator #4 shipped the valves from Orange County, within the Central District of California, to defendant TABATABAEI in Canada.

Overt Act #57: On or about June 9, 2010, defendant TABATABAEI sent an email to a person who worked for defendant AKHAVAN telling the employee to make copies of the attached invoice regarding the valves and that defendant TABATABAEI would arrange with the LLC to pick up the valves.

Overt Act #58: On or about June 11, 2010, defendant TABATABAEI sent an email to defendant MORADI and Unindicted Coconspirators #2 and #3 stating that the valves were available for pickup at the CIS office in Canada.

Overt Act #59: On or about June 15, 2010, defendant TABATABAEI sent an email to defendant MORADI and Unindicted Coconspirators #2 and #3 stating that he would arrange for the shipment company to pick up the valves and send them to the LLC in the UAE. Attached to this email was an invoice undervaluing the valves and stating that the valves cost $39 each for a total cost of $390.

Overt Act #60: On or about June 16, 2010, defendant TABATABAEI sent an email to defendant MORADI and Unindicted Coconspirator #2 stating, "[a]s per my telecom with Mr. Moradi, please find the revise invoice." Attached to the email was an invoice undervaluing the valves and stating that the valves cost $98 each for a total cost of $980.

Overt Act #61: On or about June 16, 2010, defendant MORADI sent an email to defendant TABATABAEI that stated "[b]ecause of recent political situation," defendant TABATABAEI should revise his invoice for the valves such that the total value is $20,000. Defendant TABATABAEI sent an email to defendant MORADI and Unindicted Coconspirator #2 stating that he spoke with

Unindicted Coconspirator #1 and that they agreed to send the valves with a $980 value invoice.

Overt Act #62: On or about June 18, 2010, defendant TABATABAEI sent an email to a person who worked for defendant AKHAVAN stating that defendant TABATABAEI had arranged for the valves to be shipped to the UAE the following Monday and that the employee needed to remember to change the invoice to the attached one which included an undervalued total value of the valves of $980.

Overt Act #63: On or about June 21, 2010, defendant TABATABAEI caused the valves to be sent to Unindicted Coconspirators #1, #2, and #3 at the LLC in the UAE.

Overt Act #64: On or about July 4, 2010, Unindicted Coconspirator #2 sent an email to defendant TABATABAEI that stated he should "urgently" send a revised invoice stating a total value for the valves of $9,800 with an apology letter addressed to Dubai Customs as per his discussion with Unindicted Coconspirator #1.

Overt Act #65: On or about July 4, 2010, defendant TABATABAEI sent an email to Unindicted Coconspirator #2 that stated he had attached the requested information. Attached to the email was a letter from CIS and signed by defendant TABATABAEI that stated the value of the valves was erroneously stated as $980 when they were in fact worth $9,800. Also attached to the email was an invoice stating the value of the valves was $9,800.

Overt Act #66: On or about July 21, 2010, defendant MORADI sent an email to Unindicted Coconspirators #1 and #2 with an

attachment that stated the end-user of the valves was the Bid Boland Gas Refinery in Iran.

Overt Act #67:  On or about July 28, 2010, Unindicted Coconspirator #1 sent an email to defendant TABATABAEI and Unindicted Coconspirators #2 and #3 stating that Unindicted Coconspirator #1 had met with Dubai Customs and that the problem with the valve shipment was (1) the "catalog and its pictures;" and (2) the high cost of the valves.  Unindicted Coconspirator #1 further requested that defendant TABATABAEI provide proof of the purchase price of the valves if defendant TABATABAEI had purchased the valves from his supplier for less than $6,000.

Overt Act #68:  On or about July 28, 2010, defendant TABATABAEI sent an email to defendant MORADI and Unindicted Coconspirators #1, #2, and #3 that stated he purchased the valves from U.S. Company #3 for $5,244.74 each.

Overt Act #69:  On or about July 28, 2010, Unindicted Coconspirator #1 sent an email to defendant MORADI and Unindicted Coconspirators #2 and #3 that stated the issue with Dubai Customs was that the valves were valued too high to be used on such low technology equipment in Iran.

Overt Act #70:  On or about September 7, 2010, defendant TABATABAEI sent an email to defendant MORADI that stated the Canada Export Control office blocked his account in order to stop defendant TABATABAEI's export operations.  Attached to the email was a letter from the Canadian government entitled, "Sanctions against Iran," which stated that the sanctions prohibited the export to Iran of arms and items used in the oil and gas industries.

Overt Act #71:  On or about September 8, 2010, defendant MORADI sent an email to defendant TABATABAEI stating that defendant TABATABAEI should sue the Canadian government because defendant TABATABAEI did not have any direct transactions with Iran.

Overt Act #72:  On or about September 8, 2010, defendant TABATABAEI sent an email to defendant MORADI stating that he could not win a lawsuit against the Canadian government and that defendant TABATABAEI had been signing false end user certifications.

Overt Act #73:  On or about September 14, 2010, defendant TABATABAEI sent an email to Unindicted Coconspirator #1 stating that defendant TABATABAEI has been exporting "double use" U.S.-made products to Iran.  Defendant TABATABAEI further stated that he has also signed false end user certifications, including such certifications with U.S. Company #3, and that "this is the only way to purchase these items and we all know that."

Overt Act #74:  On or about December 14, 2010, defendant TABATABAEI sent an email to defendants MORADI and Unindicted Coconspirator #1 stating that he was charged with selling products indirectly to Iran and fined $155,000 Canadian Dollars. Defendant TABATABAEI further stated that the valves were dual usage and that Unindicted Coconspirator #1 should leave him out of any further dealings with Dubai Customs.

Overt Act #75:  On or about March 14, 2011, defendant MORADI sent an email to defendant TABATABAEI forwarding contact information for someone who could assist in getting the goods out of Canadian customs.  Defendant TABATABAEI replied that an

Iranian broker would make things worse and that they should
remain in business to recover their losses.

THE PURCHASE AND SHIPMENT OF THE BATTERY CHARGER

Overt Act #76:  On or about July 21, 2010, defendant
SAHEBJAMEI sent defendant MORADI an email with a hyperlink to
battery chargers on U.S. Company #4's website.

Overt Act #77:  On or about July 21, 2010, defendant MORADI
sent an email to defendant TABATABAEI asking for him to obtain a
price quotation for a battery charger.

Overt Act #78:  On or about July 21, 2010, defendant
TABATABAEI requested a price quotation for a battery charger
from U.S. Company #4.

Overt Act #79: On or about July 24, 2010, defendant
TABATABAEI sent an email to defendant MORADI stating that a
battery charger/analyzer-model RF80K ("battery charger") would
cost $15,995.

Overt Act #80:  On or about August 16, 2010, defendant
TABATABAEI sent an email to defendant MORADI stating the battery
charger has military use and asking who the end user is.

Overt Act #81:  On or about August 17, 2010, Unindicted
Coconspirator #1 sent an email to defendant MORADI stating that
the battery chargers are "dual purpose" and that the LLC should
not participate in their sale unless defendant TABATABAEI could
get an export license for Iran which Unindicted Coconspirator #1
thought was not possible.

Overt Act #82:  On or about August 17, 2010, defendant
MORADI sent an email to defendant TABATABAEI stating that the
LLC had withdrawn from the order for the battery charger and

that there was another company in Turkey that could ship the product to Iran.

Overt Act #83:  On or about August 20, 2010, defendant TABATABAEI sent an email to defendant MORADI stating that U.S. Company #4 wanted complete information for the end user of the battery charger, and since they could not present the actual end user, that defendant MORADI should decline the order.

Overt Act #84:  On or about August 28, 2010, defendant TABATABAEI sent an email to defendant MORADI with an attachment that contained a revised quotation for $20,975 for the battery charger.

Overt Act #85:  On or about August 29, 2010, defendant MORADI sent an email to defendant TABATABAEI that stated he would purchase the battery charger if the price was $20,000 and stated that defendant TABATABAEI should provide his "Iranian" contact information to arrange payment.

Overt Act #86:  On or about August 30, 2010, defendant TABATABAEI sent an email to defendant MORADI accepting the offer of $20,000 for the battery charger.

Overt Act #87:  On or about August 31, 2010, defendant TABATABAEI sent an email to defendant MORADI asking how long it would take to transfer the money and whether the money would be coming from an "Iranian source."

Overt Act #88:  On or about September 13, 2010, defendant TABATABAEI sent an email to U.S. Company #4 that stated the battery charger should be shipped from the factory to defendant TABATABAEI's facility in Mexico.

1    Overt Act #89:  On or about September 14, 2010, defendant

2   TABATABAEI sent an email to his shipping company with a link to

3   the battery charger and stating he would be shipping the battery

4   charger to Mexico, then re-exporting it to Turkey.

5    Overt Act #90:  On or about October 13, 2010, defendant

6   TABATABAEI sent an email to U.S. Company #4's Canadian

7   distributor that requested banking information so that defendant

8   TABATABAEI could wire payment for the battery charger.

9    Overt Act #91:  On or about October 15, 2010, defendant

10  TABATABAEI sent an email to defendant MORADI stating that

11  payment had been received.

12   Overt Act #92:  On or about November 16, 2010, defendant

13  TABATABAEI caused the battery charger to be shipped from U.S.

14  Company #4 from Orange County, within the Central District of

15  California, to Mexico.

16   Overt Act #93:  On or about December 10, 2010, defendant

17  TABATABAEI sent an email to defendant MORADI stating that the

18  battery charger was about to leave Mexico to Turkey.

19  THE PURCHASE AND SHIPMENT OF THE GEARMOTORS

20   Overt Act #94:  On or about August 1, 2010, defendant

21  SAHEBJAMEI sent an email to defendant MORADI containing a link

22  to U.S Company #5 and stating that defendant SAHEBJAMEI needed a

23  Model B-2730 gearmotor.  Defendant MORADI forwarded this email

24  to defendant TABATABAEI and requested a quotation for the

25  gearmotor.

26   Overt Act #95:  On or about August 3 and 4, 2010, defendant

27  TABATABAEI requested a price quotation for 50 gearmotors from

28  U.S. Company #5 and stated that the gearmotors would be used by

1   defendant TABATABAEI's recycling plant in British Columbia,
2   Canada.

3       Overt Act #96:   On or about August 13, 2010, defendant
4   TABATABAEI sent an email to defendant MORADI stating that the
5   cost of the 50 gearmotors from U.S. Company #5 would be $74,000
6   plus $850 shipping.

7       Overt Act #97:   On or about August 16, 2010, in response to
8   a request, transmitted by an intermediary working with U.S.
9   Company #5, for required information as to the end users of the
10   50 gearmotors, defendant MORADI advised that the 50 gearmotors
11   would be used for a military application.   Thereafter, defendant
12   MORADI secured the intermediary's continued collaboration in
13   providing goods to Iran's oil and gas industries.

14       Overt Act #98:   On or about August 27, 2010, defendant
15   TABATABAEI sent an email to defendant MORADI with a revised
16   quotation for the 50 gearmotors for $159,200 plus $950 shipping.

17       Overt Act #99:   On or about August 28, 2010, defendant
18   TABATABAEI sent defendant MORADI an email stating that the
19   increased cost was "base[d] on the risk assessment."

20       Overt Act #100:   On or about August 30, 2010, defendants
21   MORADI and TABATABAEI agreed on a price of $2,100 per gearmotor
22   for a total of $105,000.

23       Overt Act #101:   On or about September 22, 2010, defendant
24   TABATABAEI sent defendant MORADI an email requesting that he
25   transfer $42,850 for 20 gearmotors.

26       Overt Act #102:   On or about January 5, 2011, defendant
27   TABATABAEI sent defendant MORADI an email requesting the

28

application and use of the 20 gearmotors to give to Mexican customs.

Overt Act #103: On or about January 22, 2011, defendant MORADI sent an email to defendants TABATABAEI and SAHEBJAMEI stating that the 20 gearmotors were to be used for robotic painting in the auto industry.

Overt Act #104: On or about February 4, 2011, defendant MORADI sent funds to defendant TABATABAEI to pay for the 20 gearmotors.

Overt Act #105: On or about February 9, 2011, defendant MORADI sent an email to defendant TABATABAEI asking that ten gearmotors be sent to Turkey and ten gearmotors be sent to Dubai as soon as they arrived in Mexico.

Overt Act #106: On or about February 17, 2011, defendant TABATABAEI signed and provided an end use statement to U.S. Company #5 acknowledging that the 20 gearmotors would remain in Mexico and "not be diverted to ... Iran" in accordance with U.S. Export Control Laws.

Overt Act #107: On or about February 24, 2011, defendant TABATABAEI caused U.S. Company #5 to ship the 20 gearmotors to defendant TABATABAEI in Mexico.

Overt Act #108: On or about March 14, 2011, defendant TABATABAEI caused the 20 gearmotors to be shipped from Mexico to Turkey.

Overt Act #109: On or about April 11, 2011, defendant MORADI received an email from an Iranian shipping company that stated the 20 gearmotors were to be dispatched by the first

available courier to Tehran.   Defendant MORADI forwarded this email to defendant SAHEBJAMEI.

     Overt Act #110:   On or about May 14, 2011, defendant MORADI paid defendant TABATABAEI's mother in Iranian Rials for the shipping cost of the 20 gearmotors.

COUNT TWO

[50 U.S.C. §§ 1701-1707; 31 C.F.R. § 560.204]

On or about June 2, 2010, in Orange County, within the Central District of California, and elsewhere, defendants ABBAS MORADI, SHAHIN TABATABAEI also known as ("aka") "Shahin Tabatabae," aka "Sean Tabaei," aka "Sean Taba" aka "Gary Sean Williams," aka "Alex Moore," knowingly and willfully violated the United States trade regulations with Iran by attempting to export and exporting, from the United States to Iran, via the United Arab Emirates, ten 3-way, 2-position, type SV326S8 solenoid valves, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury, Office of Foreign Assets Control, for such export.

1           COUNT THREE

2        [50 U.S.C. §§ 1701-1707; 31 C.F.R. § 560.204]

3        On or about November 16, 2010, in Orange County, within the

4    Central District of California, and elsewhere, defendants ABBAS

5    MORADI and SHAHIN TABATABAEI also known as ("aka") "Shahin

6    Tabatabae," aka "Sean Tabaei," aka "Sean Taba" aka "Gary Sean

7    Williams," aka "Alex Moore," knowingly and willfully violated

8    the United States trade regulations with Iran by attempting to

9    export and exporting, from the United States to Iran, via the

10   United Arab Emirates, one battery charger/analyzer model RF80K,

11   without first having applied for and obtained by such

12   application the necessary license and authorization from the

13   United States Department of the Treasury, Office of Foreign

14   Assets Control, for such export.

15                              A TRUE BILL

16

17                                  /s/

18                              Foreperson

19   ANDRÉ BIROTTE JR.
     United States Attorney

20

21

22   ROBERT E. DUGDALE
     Assistant United States Attorney
     Chief, Criminal Division

23

24   PATRICK R. FITZGERALD
     Assistant United States Attorney
     Chief, National Security Section

25

26   MARK P. TAKLA
     Assistant United States Attorney
     National Security Section

27

28   MELISSA MILLS
     Assistant United States Attorney
     National Security Section